Margaret Gosney, now known as Margaret Finnegan, Appalachia, Gregory Jumbach. Proceed, counsel. Good morning, Honorable Justices and Mr. Jumbach.  Good morning. Good morning. I think that at this point in time, this is the third time this case has been before this court, that I think it's fairly clear that what we have here is a trial court that's dead set on aiding Mrs. Finnegan, Ms. Finnegan. Regardless of what the facts may be or what the opinions of this court have been, I realize that with regard to the notice question here, it's a manifest way to the evidence review, and generally much deference is given to the trial court under those circumstances. But here I feel that there was absolutely no evidence that the notice of the supposed September 2005 pleading was ever served upon Mr. Gosney or his counsel. We start out with Mr. Levine and the members of his office staff and Mr. Gosney all saying, we never saw this. And we have Mr. McCarthy saying, I mailed it and I faxed it. And at that point, it's a tie, and the judge can determine who's credible. But in this instance, there's a lot more than those two people's testimony. First of all, there's no explanation why a supposedly pending petition for modification would never have been mentioned in more than ten continuance orders in this case. Mr. Gosney's petition that he had filed was mentioned in all of those orders, and never did it say that this is also being continued on Ms. Finnegan's petition. There's no explanation why Mr. McCarthy would not have gone to his allegedly closed file to find his alleged facsimile service, his testimony at the hearing being, I faxed it, but I don't have my fax notice because my file's closed. Mr. McCarthy testified, I normally don't file notices when I file a petition, and that may or may not be the case, that may or may not be fine. But what about a proof of service on your petition for modification? There's just absolutely no indication in that September 05 petition that it was ever attempted to be served by Mr. McCarthy. And the evidence is 100% clear that neither Mr. Gosney's attorney nor Mr. Gosney ever received it. Ms. Finnegan acknowledged and stipulated that Mr. Gosney did not know about this petition until at least July of 2006. And also, Mr. Levine showed the court the July 2006 motion for extension of time which had attached a copy of the alleged September 2005 warrant, and that copy was unstamped completely. Then Mr. McCarthy notices up the modification petition in July and cannot explain why that was necessary to do if it had been noticed up a year before or nine months before and had always been pending. Section 510 of the Illinois Marriage and Dissolution of Marriage Act says that modifications of either support or maintenance cannot accrue until a date subsequent to due notice by the moving party of the filing. And there is simply, other than Mr. McCarthy's completely undocumented say-so, there's absolutely no evidence here that due notice took place. And the court will recall and ensure that in its first ruling in this case, the court ruled that there could be no maintenance to Ms. Finnegan after April of 2006. This petition was not noticed until July of 2006. And accordingly, any increase in the maintenance during the period of September 2005 to April 2006 should be vacated because due notice had not been received. Also with regard to support, no support. The court did give different amounts of child support and did it back to September of 2005. And our position is that there can be no change in the amount of support prior to July 2006. Then also with regard to the maintenance, in this court's initial decision in this case, it found it had been appropriate by the trial court in an unappealed order to have divided the original $10,000 a month into separate support and a separate maintenance order. The court also ruled that the parties' agreement was an enforceable agreement. In that vein, the court ruled that there could be no maintenance after April of 2006 regardless of the fact that the amount had been changed, I believe, sometime in 2004. Well, the Merrill Sutherland agreement was that only Mr. Gosney could modify maintenance and that even if one does not read it that way, and I think one has to because it was written in and initialed by the parties that modifications could only be by husband, the agreement said maintenance could only be modified if there were extraordinary circumstances. Now, the basis upon which the court ended up modifying the maintenance from September of 05 to April of 06 was that Mr. Gosney had received an increase in income. Well, as I set forth in my brief, the words extraordinary circumstances, I don't think could possibly embrace, even if it's decided it's fitting and could go into modifying maintenance, could not possibly embrace an increase in income because those words would be totally unnecessary since 510 allows for modifications based on a substantial change in circumstances, which there's a legion of cases that includes an increase in income. So if the parties agreed that extraordinary circumstances would have to exist, they agreed that only Mr. Gosney could modify the agreement, and the Supreme Court has cited in the brief Blum v. Koster, parties' agreements on maintenance are to be enforced regardless of the language of 510, even if it conflicts with that. So even if ordinarily Ms. Finnegan could have gone in and said he's got a substantial increase in income, these parties agreed A, she could not go in, B, a substantial increase in income would not be sufficient to support a modification. Then the last issue is the court's findings with regard to Mr. Gosney's income. And in that regard, I would say that the proof this time is a little different than it was the second time that this court entered a reversal. Mr. Gosney is affiliated with his wife's business, but he independently develops his own business. He's responsible for his own business expenses and his fair share of the general office expenses. That was his testimony after the first remand, and this court found it credible. All that happened different the third time around is that the numbers were actually plugged in by Mr. Gosney. Here's how much money I made, here were my individual expenses, and here's my share of the office expenses, which was not an unreasonable amount, it was 14%. Then the court took those numbers and just gratuitously tossed them out without any real basis for doing so. There's nothing inherently wrong with Mrs. Wedling, who after all had built her business up over many years, not wishing to pay the expenses for Mr. Gosney's business. And while it's true that they are spouses, this is a second marriage for each, and they each know things don't always necessarily work out great. So for Mr. Gosney's independent business to bear its own share of the expenses is not manipulative, and it wasn't done to deprive Ms. Finnegan of support. In fact, this court expressly set forth in the second Gosney appeal that Mr. Gosney is not a person who has sought to escape his obligations. He's paid everything he was supposed to pay and increased his payments without a court order during a period of time, I think it was late 06 and early 07, where his income had increased and no petition had been filed. I don't think that Mr. Gosney and Ms. Wedling do anything unorthodox that wouldn't happen in just an ordinary partnership. If someone's a 10% partner and they produce 10% of the revenues, then their 10% of the revenues are paying 10% of the expenses. This isn't a partnership, but the revenues and expenses are handled in a similar fashion and not suspiciously. So I think that in sum, what we have here is retroactive support and interest on that retroactive support that was granted during a period of time and Ms. Finnegan, where Mr. Gosney was not under proper notice and both the support and the maintenance of both of those should be vacated. Even if notice is deemed to have been proper, she wasn't eligible for the retroactive maintenance that the court ordered under the agreement that she entered into. So what Mr. Gosney is requesting this court to do is to vacate the retroactive amounts. Now, not entirely because there is some, the 2007 retroactive child support was based on Mr. Gosney's actual tax return and he had received notice by that time. So I don't think that part of it should be vacated, but any additional maintenance should be vacated because there was no notice and even if there was, there was no basis under the agreement for a modification to take place. This court has also respectfully requested to remand this cause for the child support to be determined on Mr. Gosney's real income, not on the court's continuous insistence that there's some sort of phony deal going on with Mr. Gosney and his current wife. Let me ask you something. Before he, your client, went in a partnership with his new spouse, what was his income the year before that? Well, the very year before that he had some termination pay from Dearborn Partners and one of these courts' prior opinions, they spell out how he worked for Dearborn Partners and the last full year he was there he made a great deal of money. He made over $700,000. Okay, what about the year before that? The year before that when he was terminated, which both the trial court and this court found was involuntary, he got $340,000 that ended in, I think, April of 2007. I'm pretty sure that was the end of his pay from there and part of it was some sort of severance that he was getting. Then the testimony was, and again it was accepted by both the trial court and this court, that he works in a limited area and his job search had been appropriate. His limited area is he raised, he solicited union pension funds to have their money managed by Mr. Gosney's associates. Mr. Gosney himself is not a money manager and he got paid on commissions. He looked for a job. He couldn't find one. He had met his current wife and she does the same kind of business. She has a different business. Right. I think in her published opinion, in her testimony, she runs a hard fee referral business. Right, except the testimony was, I believe, that the business that Mr. Gosney had always been in had turned into a hard fee business. It was no longer, because of government regulations and the conditions of the economy, it was no longer a condition-based business. Well, in essence, you understood my question. You read between the lines, so there's no evidence to support that your client was voluntarily underemployed. No, and the court, I believe, found some in the second opinion that he wasn't voluntarily underemployed and he, in this trial that this appeal is from, he testified as to his efforts to get business. His income had actually gone up in that regard from the first trial leading to the second appeal to this trial. His income had gone up. He had gotten a couple of other customers. He travels around the country looking for these union retirement funds for him to get managers for them. Are there any other questions? Thank you. Thank you, Counsel. May it please the court. Mr. Ostro. I'm Gregory Jumbeck of Reach Jumbeck and Associates on behalf of Margaret Finnegan. And this is the third wheel up to your honors. To address, Justice Schmidt, one of your questions to Mr. Ostro. The year prior to the termination of Mr. Ghazni at Dearborn Partners, I believe he had earned roughly $791,000. In 2007, the year that he was terminated from Dearborn Partners, he made, I believe, $341,000 through March 31st of 2007. It is from that point that the second appeal was taken where this court found that Mr. Ghazni had not evaded his child support obligation in terms of his job search. The issue on remand in this case from the second appeal in which this third appeal was taken, the trial court's findings are completely different because they don't deal with Mr. Ghazni not having appropriate employment. In terms of the actual calculation of his income, it was what the deductions were that he was claiming. Now notably, Mr. Ghazni couldn't explain as to how the accountant or his wife got to the numbers that were charged against his gross income or his gross revenues in order to get to his alleged income. Some of the factors that were included or deducted from Mr. Ghazni's income were the rent expense, profit sharing plan costs for all the employees, 941 taxes for all the employees or the employer match portion, which means that he's also paying for a portion of his own match, which is the obligation of the employer to the federal government, as well as his portion of match of Social Security and Medicare, as well as all of the other employees. Health insurance for all of the employees, work comp insurance premiums for all of the employees, general payroll expenses for all of the employees, office supplies for the entire office, the business's charitable contributions, as well as travel and attendance at seminars for all of the employees. He's paying the percentage. He's paying, correct. He's charged a percentage of them. However, he has no ownership interest in the business. They also try to fix his gross income based upon only the revenue that he generates. However, his testimony was at the first trial, leading to Ghazni 2, and again on remand, which is the subject of this appeal, that he does work and he does assist in generating income for his wife's clients, that the software that's used isn't, which he's also charged a portion of. She has to pay no matter what. She had the software before he came. She would have the software if he wasn't there. The only additional- There's no indication that these are software updates or modifications. I believe that Mr. Ghazni testified that there are some updates that come out. Don't we all know that? Sure. The software in their office and everything else. Absolutely. But the problem is that these are expenses that she had, and she would have the update expenses, the software update expenses, even if he wasn't there. The only testimony to new costs that were incurred was one additional employee that came on, and there was some build-out, which presumably was for another office for him. All of the other employees, I believe, including Mr. Ghazni and Ms. Wendland, there's a total of five employees, two of which are part-time. Even the additional employee that was added was a part-time employee. Basically, Mr. Ghazni gets no credit for the work that he does on his wife's clients. I think it's also notable that Ms. Wendland, as noted in Mr. Osler's brief, earns roughly $300,000, according to the testimony, and that she earns more than Mr. Ghazni does. However, Mr. Ghazni pays for 100% of both of their living expenses. So even though she's earning this additional income, she's lived with him since their marriage to each other, and even though he's had this reduction of income, and she's earning more than he is, that he's still only responsible for 100% of the expenses that were listed on his income expense affidavit. So did Judge Brum and Dobby fix that up? I think he fixed that up by, well, I think it goes exactly to his findings as to the credibility, not only of the tax returns, but of also the accountant statements that were introduced. And that was that they were ashamed that they were going to credit him because the expenses that he's charged, and again, one of the key issues that Judge Brum had found was that there's no written employment agreement. Well, let me ask you, let's just, you know, legal, you know, in the law profession, wouldn't you like to go to work someplace, a big firm that says, you come in, I'm just going to, you know, the senior partner says, I'm going to pay all the expenses of this thing because I had those expenses before you got here. You come in, take your business, make a bunch of money, and whatever personal expenses, additional expenses you incurred when you got here, you pay those. But I'll pay all the other expenses, and it seems to me that scenario, the new guy could be making a lot more money than the guy that's sitting there paying all the expenses. Like, that'd be a pretty sweet deal, wouldn't it? It would be a sweet deal. And maybe there, I wouldn't disagree with you, Justice Schmidt, that there's probably some component of additional overhead that maybe you would fix if Mr. Gosney had a salary, or if there was some written structure. There's no evidence, and there's nothing I could cross-examine Mr. Gosney on. Well, if he had a written structure, wouldn't you say that was a sham between the husband and wife that they set this up, that that was the stuff, whether it was in writing or not? What? Whether it's reasonable or not. It is whether it's reasonable, and notably, it's under 505A3H, I believe it is. It was Mr. Gosney's obligation to demonstrate that the expenses that are deducted from his gross income were reasonable and necessary for the production of income. He didn't even know how those numbers were gotten to. He testified that he has no idea what the input was. He had no conversations with the accountant. And, in fact, it was myself who put those exhibits into evidence. They only put forth his W-2s or his quarterly pay stubs. They didn't introduce how you get to his income at all. It was simply, this is what it is, and you should accept this. And when you go through, I mean... So what did you introduce? I'm sorry? What did you introduce? He puts in his W-2s, right? He put in the W-2s. The statements which are attached to Mr. Oster's appendix, which he testified were the statements from the accountant. All of the input was generated by Mrs. Wenling, or Ms. Wenling, excuse me, and her accountant. Mr. Gosney can't testify as to, could not testify as to what the rent was, what the 941 tax expenses were, or the matches. All he testified to was, this is what they tell me that I pay, or this is what they tell me that I'm charged with. Well, the question isn't whether he knows how those figures are arrived at. It's whether those figures are accurate and were actual deductions. But we don't know. The problem is that not even Mr. Gosney knows. But he doesn't have to know, does he? I believe in order to assert that... I doubt many associates in law firms know about how expenses are arrived at for the copier and the paper and the toner. What is the evidence there to refute whether those were actual expenses or not? The problem is, Justice Holder, is that we don't know if those expenses were even actually incurred. Frankly, it's... You did have testimony, didn't you, from an accountant? You did not. Absolutely not. There was no testimony from an accountant. When the case came back down after the second remand, Ms. Wenling never even testified. The exhibits that were introduced demonstrating the deductions that Mr. Gosney claims that he should be entitled to were just tendered in discovery, pursuant to a 237 notice. Ms. Wenling was never called to testify as to them. Their accountant was never called to testify to them. The claim is, and always was in the trial court by Mr. Levine's office and by Mr. Gosney, that these were reasonable and necessary business expenses or debts incurred that relate to the production of income. If you're going to claim those expenses, it's necessary that you present the evidence that those are in fact reasonable and necessary and that they're debts. They never... He never testified to any of those. Only on... I can't remember if it was cross-examination or when I called him as an adverse witness or an adverse direct, that any of these were brought up. He merely said that I get, I bring an X amount of dollars, and then my wife tells me what the deductions are, and that's where it goes from there. Okay, so what do you say his gross income was? I think for 2008, we had asserted that it was at least $108,000. His gross? I believe it was $108,000 was his gross. Correct. That was... I'm sorry, that's what he testified that he thought it was going to be. And then once the remand came down, it came out to $40,000 or $42,000, I believe is what he said it was. $42,000. I believe it was $42,000. I'm sorry. And then as each of the years went by, 2009, then I think we had the first quarter of 2010 was all that was available at that point in time. Our assertion is that he should at least be charged what he actually does bring in. Because, I mean, Mr. Geisen's testimony was that he gets up somewhere around 6.30 in the morning to start work, and he works at least 12 hours a day most days. And then a lot, he also has to do work for his wife's clients. To say that he gets no credit, and under the, Justice Schmidt, your hypothetical of, well, if you are an associate, you come in, and the old partner is paying for 100% of the expenses, you have the ability to make more. Well, then there's also the question of, is that associate or junior partner, for lack of a better term, putting in work on the senior partner's cases? And aren't you then getting some, or shouldn't you then have some credit because you've actually done some of the work on somebody else's cases that you're not actually generating a revenue for? And so to say that, at least to base it off of his and say whatever he does for his wife is gratuitous or going towards his, quote-unquote, portion of the overhead expenses, I don't think that that would be unreasonable. And also, the fact is, we don't, the only testimony, again, was that the additional expenses was one part-time employee and a little bit of a build-up. None of the expenses other than that changed from what ICS was doing prior to Mr. Gasney coming in and while Mr. Gasney was working at Dearborn Partners or his former employment. To get to the issues of the notice. Well, can't we figure out the, I don't think he has, I'm not clear. So what is his gross income that you're arguing? Pursuant to the exhibits that were admitted, each year. We have an 08-42,000, right? We have an 08-42,000. How much in 09? In 09, hold on one second, I apologize. It's actually attached to these appendix. For 2008, I'm sorry, the first quarter of 2009, his revenues were 28,750, was his gross. For the second quarter of 2009, it was 38,937.50. For the third quarter, it was 55,042.50. And for the fourth quarter of 2009, it was 55,042.50. Those were the exhibits that were admitted to the court. Our stance is that when you add all those up, I believe it got to right around $215,000 in that general ballpark. Correct. That was his gross income. One of the complaints was under the motion to reconsider, and I believe it was also addressed by Mr. Ostro in his brief here, was that Judge Brumman then took the actual taxes paid by Mr. Gosney, instead of basically not only imputing an income onto him, but also imputing tax consequences onto him. And our stance would be that under Section 505, it's taxes that are properly calculated federal and state taxes. How much did Brumman give him in terms of the overhead? In terms of the overhead, I don't believe he gave him—it's not really stated within the order. I don't believe it's stated within the decision. I think if you work out the numbers, he didn't give him much in terms of the overhead. And again, our position was, frankly, to the extent that we— He imputes income but doesn't impute expenses. Correct. And my closing argument, which is also obviously contained in the common law record because they were written closings, was that if he's doing this work for his wife and he's testifying that he's working 12 hours a day, he unequivocally testifies that he's not working 12 hours a day on his own clients, that he's compounding this research from the software. I think he even said that he even has a TV on nonstop to watch what stocks are doing in order—how they're going to advise the plan administrators to invest their funds and whatnot. He's doing that across the board. So his wife—and he testified that his wife absolutely benefits from the work that he does. I think she even testified, which was subject to GASNY 2, that the reason that she hired him and brought him on because he was a, quote, instant door opener, he had instant credibility in the industry, and she thought that he was going to open up all these doors. To the extent that he does all of those things, I think that a reasonable amount is exactly working for her, assisting her in compiling this research and compiling this data and compiling these numbers, and then charging him basically his gross revenues isn't unreasonable because— Your time starts in two minutes. Thank you. Under the circumstances, he could just as easily be working out of his— I would say that from the testimony and having sat through it, I think he could sit at home and basically only have to pay for the software and a little overhead expense to do the same kind of work and research that I enlisted him to do outside because a lot of it is going out and actually getting the clients in the door, wielding and dealing, and I think— Do you want to—you have a little time left. Sure. I want to address the notice quickly. We did an entire day's worth, almost three hours of testimony on the issue of notice. The notice of filing was admitted as an exhibit without an objection from Mr. Gadsden's counsel as to, I believe it's September 22nd or September 25th, 2005, notice of filing. Was there a proof of service on that? There was a proof of service on that. And as I state in my brief, the case law is clear that even 100 percent compliance with Supreme Court Rule 12b is not necessarily necessary. It's substantial compliance with Supreme Court Rule 12b. The proof of service that is on the notice of filing is 100 percent, word for word, outside of the obvious date and time, compliant with Supreme Court Rule 12. So the fact that it wasn't—there's no dispute that it is not contained within the common law record and that the notice of filing itself was not filed. The circuit clerk's minutes, admitted by Mr. Levine on his testimony, reflect the fact that it was filed—the notice, to increase in extent, was filed on September 5th, 2005. And I cite the case law within our brief that that is, to the extent of a new complaint being filed, it's when it's actually filed with the clerk's office in terms of a complaint actually being filed. 510 says the notice of filing, the notice of a filing of a motion. That was sent to Mr. Levine. Mr. Levine admitted, and his secretary admitted, that their own clients and opposing counsels complained that they don't get things. That when they send things out in the mail, their clients say, well, I never got it. Or opposing counsels say, I never got your motion. And that things get lost in the mail. And over the 40 years of his practice, that that's happened on well more than one occasion. And that's what Judge Brumman found was more likely true than not. He made no credibility findings against Mr. Levine and Mr. Shugan. He made no credibility findings against Mr. McCarthy. He simply found that it was more probable than not that that's what had occurred. As it relates to all the continuance orders, many of them simply say, all pending. Counsel's time. Thank you. If there's no other questions. Thank you, counsel. I could be incorrect, but I'm not familiar with the notice of filing a proof of service that was file stamped and is in this record from September of 05. There is a file stamp motion to extend, but it was without a proof of service. I could be incorrect, but that's why Mr. McCarthy was asked if he had proof of his alleged allegation that he had served by facsimile. And he could not produce one. But I would be at this point more like to talk more about Mr. Gosling's income in the limited time that's left. There were actually attached to our, in our appendix, I think on pages 32 to 35, are charts that Mr. Gosling prepared and testified that they were from the business records of precisely the expenses that had been charged back to him. Now, a lot of those expenses were his own individual expenses like travel. They weren't all 14% of common expenses. And in terms of 14% of common expenses, Mr. Jumbach just said the last year we know of Mr. Gosling's income, he made $200,000 and Ms. Gosling made $300,000. So to say charging with 14% of the expenses, I think that's pretty modest under those circumstances. But you also have his own individual expenses, which certainly one would be hard-pressed to say he shouldn't be allowed to charge against his income. But the bottom line is, if you, there was an additional $80,000 that Judge Brumman added to his income just saying, oh, I don't believe he has any of these expenses. And that is essentially saying that Gregory Gosling was trying to cheat the government out of its tax share on the $80,000. And he was trying to cheat Margaret Finnegan out of approximately $1,000 a month in child support when he had absolutely no history of doing anything of either one of those natures. Also, Mr. Jumbach is incorrect that there were not more additional expenses by virtue of Mr. Gosling coming on board at ICS. They actually got larger quarters. He testified, and Mrs. Wendland did testify the first time. And her testimony is still part of this record leading to whatever conclusions may be made about Mr. Gosling's income. But she testified the first time around in the same system that Mr. Gosling testified to the second time, and that it was set by, the 14% was set by the accountant. So I think that what has to be concluded here is that Mr. Gosling is an honest man. He's always given Miss Finnegan a fair shake. He's not trying to not give her a fair shake now. There was no evidence of that. The business income set up between him and Miss Wendland was fair. And Miss Finnegan should be paid based on his real income, not his income as Mr. Jumbach and Judge Brumman would have it be. Opposing counsel's standard is that you're burdened to prove that these were reasonable and necessary expenses. What besides his chart and breakdown would support that they were? Well, the fact that at the first trial, and at the second trial too, but at the first trial, Miss Wendland testified as to we have rent, we have phones, we have employees. I expect my agreement with Mr. Gosling was he would pay his fair share of those. We also have Mr. Gosling testifying at the second time how he compiled these charts in terms of what his income was, and in terms of what the accountant had said the total expenses were, what his individual expenses were. I believe he had check records too. I didn't want to burden the court with an appendix of all his checks, but it was not, there was no indication at all that this was done fraudulently, that either the agreement between him and Miss Wendland was fraudulent, or that the expenses that were claimed were not actually incurred. Counsel has one minute. What percentage of the total expenses was he? 14%. 14%. Right, of the common expenses, he was- It was across the board expenses. Pretty much. There may have been a couple of exceptions here and there, but- Which is for every employee. Right, but he said that the testimony was he used all the common employees for his own business. He might have also helped out Miss Wendland from time to time. I'm a sole practitioner. I office with a matrimonial firm of eight lawyers. If I see a case come down, I email it to every lawyer in that office. I mean, I think that's just your responsibility. It's common courtesy. So, I don't see why, because he, the work he does looking into how the investments are managed is transmitted to his wife and may help her clients, means, well, you don't have to pay anything anymore. You know, it just, that seems nonsensical to me. I think what the charges against him, there's no, the claim is you shouldn't have to pay anything, really. It's not, the claim isn't 14% is an unfair number, and so you shouldn't have to pay. Well, he should have to pay. It's his business. It's his income. It's extra expense. It's extra time for all the employees, and he should pay his fair share. Basically, the trial just treated him in calculation and summary as an employee only, right? Right. Not in terms of the, he called the arrangement a sham. It's not a sham. Thank you, counsel. The court will take this case under advisement and render a decision with dispatch. At this time, we'll take a short recess for panel change. All rise. Court is in recess.